Good morning, your honors. If it pleases the court, I am Bruce Prate on behalf of the appellants and defendants and I'd like to reserve five minutes for rebuttal if necessary. The district court in this case was put in a very awkward position because the Supreme Court's decision in White v. Pauly had just been issued and the district court clearly was wrestling with a clearly established prong of qualified immunity. In fact, at the time the district court relied erroneously on Hughes v. Casella, which of course was later reversed by the Supreme Court. I think before we get to that prong and depending on which prong you choose to address, the evidence in this case, because we have video which is becoming more and more prominent in these cases, because we have video there really is no disputed fact. The only disputed facts that the district court could grasp onto were an argument that maybe Mr. Ortiz had been, or Mr. Pena, I'm sorry, had been somehow flailing because of the taser. It's really interesting when we have this video because we not only consider whether there's a disputed fact, but we consider the reasonable inferences that you can draw from the facts. And so I think the question here is what are the reasonable inferences to be drawn? Well, and that's a great question, except that in this case you see that Mr. Pena very clearly, and it's there's no doubt about it, he grasps the knife in his left hand. This is not some involuntary action on his part. Whether he was scooting forward toward the officer because of the taser applications, perhaps you could remotely draw some inference in that regard, but the volitional act of grabbing the knife and raising it at the officer when he's in less than five feet, which is undisputed, the officer, I mean, as this court said in Scott versus Henrich, the officer doesn't have to wait to see the glint of the knife. Any reasonable police officer seeing this individual under the totality of the circumstances, and unfortunately the district court tried to parse out individual facts saying, well, maybe he could have been flailing, or maybe he had, the officer had some duty to retreat, but the officer did back up. He backed up to the threshold of the door where he's got a staircase behind him and a domestic violence victim that he can't focus on what's behind him when he's dealing with an aggressive individual coming toward him who's already challenged him to fight. As the district court pointed out, Mr. Pena told the officers, come on, when he clenched his fist, which is what resulted in the taser in the first place. Then Mr. Pena does grab the knife or the knife falls out. He's then scooting forward, which is very clear, scooting forward toward the officer who's yelling at him and pointing a gun. People don't involuntarily scoot towards uniformed police officers pointing a gun and then grab a knife and raise it at the officer. Wasn't he saying, like, why, why? Like, he was almost trying to reason with him? Well, he was saying why to his wife. If you listen to the video, he's saying why. I didn't do anything to you. But he was saying why to the police officer. Well, I don't know that... She's now downstairs, isn't she? No, she's on the staircase. On the landing? Yes, she's on the staircase behind him. The officer, quite honestly, doesn't know exactly where she is because he's obviously focusing on Mr. Pena at the time. So I think under the first prong, because as the Supreme Court said in Scott versus Harris, if the inferences are overwhelmingly rebutted by the video, then there is no material issue of fact. And I think one other error that the district court made was to focus on the initial crime, the domestic violence. Many of these cases, from Mattis to George to Lell, a lot of these cases start out with relatively minor offenses, whether it's a traffic stop or domestic violence. But the focus really needs to be on what's the offense that the officer's responding to when they deploy, in this case, deadly force. Circumstances change. And as the Supreme Court has told us time and time again, they're rapidly evolving stressful, tense situations that the officer has to respond to. And frankly, I think these officers use commendable restraint in that they attempted, with three cycles of the taser, to contain Mr. Pena unsuccessfully, unfortunately, because then he grabs the knife and came at the officer, who then fired one round. And it's clear that the officer still believes he has the knife. I mean, I've watched that tape I don't know how many seconds the knife is in the 1.6 seconds between the two shots. And then Mr. Pena actually sits up and is still on top of the knife and the officer's yelling, he's still got the knife, he's got the knife. So I think when you look at the totality of the circumstances, even on the first prong of qualified immunity, the actions of the officer are objectively reasonable. So Pena never leaves. Once he's been hit by the taser, he is on the floor. All right. And then he sits up. Yes. But he doesn't stand up. He does not stand up. So all he can do is just sort of scoot his bottom on the floor towards the officer. How tall is Mr. Pena? Do we know? I don't know. I'd almost be guessing, but I think it's about five, eight, five, nine. Okay. He's not terribly tall. Not terribly tall for sure. Not a long reach with an arm. No, but he's less than five feet when he's coming up with a knife at the officer, who at that point feels that he has to remain stationary in the doorway. If you're in a sitting, if you're in a sitting position, there's not much that you can do other than, other than what in the Boy Scouts used to refer to as the blood circle. That is what you can reach with, with the tip of the knife and your, and your arm. Right. The femoral artery, the groin, all kinds of things are within immediate reach of Mr. Pena. What about shooting or shooting his leg or, I mean, why deadly force? I mean, well, that's, isn't that, I mean, that's unfortunately unrealistic that happens on television. Officers are, no, I, sorry, don't demean me like that. I was a district court judge. I tried these cases. I know what the experts say. I am not talking about television. Okay. And I apologize, Your Honor. But officers are taught in that split second to shoot for center mass. It would be nice to say that the officer could somehow focus on the hand that has the knife. But if the officer misses, he doesn't know what's behind him. And, and now the officer gets stabbed. So, and I apologize. I didn't mean to demean the court. But. But retreating from a guy who is, who is seated and can only scoot himself is not terribly difficult for an officer. Right? I mean, he can back up a foot or so and be well out of, out of harm's way. So the guy can't strike very quickly. Well, I, I believe he could have because Officer Vizcara did retreat all the way to the threshold. If you recall, he's in the middle of the room and as Mr. Pena continues scooting forward, the officer continues backing up until he reaches the threshold, at which point he doesn't know what's behind him. Sure, he could look, but then he becomes vulnerable to the individual who has grabbed a knife. Nobody told Mr. Pena to grab that knife. He did that of his own volition in the face of a uniformed police officer pointing a gun at him. And there's only one inference that can be drawn from that, is that he intended to stab the officer, cut the officer. If you then go to the, which of course this court in, even if there was some inference that could be drawn on a, an as this court recently decided in Voss versus Newport Beach, in the Supreme Court, well, in this court as well, in SB versus San Diego, the mere fact that there may be an inference or material fact at issue doesn't end the qualified immunity inquiry. And we then have to determine, was there a clearly established law that would have put these officers on notice beyond debate under the facts of this case, which the Supreme Court has said in excessive force cases, it must be factually specific, that would have put these officers on notice, and as the Supreme Court said in Sheehan, no matter how many times the officers read any of the cases cited by the plaintiffs or the district court. The district court found that there were other, citing the plaintiffs as expert, says Viscotta had several other less intrusive options available such as stepping back, using his taser again, telling Decedent to drop the knife, warning Decedent he was going to use deadly force, and telling Brambilla to discharge his taser. In light of this expert testimony, a reasonable jury could conclude alternative techniques were available to subdue Decedent rather than use of deadly force. So what's your response to the district court on that? Certainly. And as this court decided in Scott versus Henrich, in these situations, officers are not required to use the least intrusive, but these officers, in fact, did. So this is wrong as a matter of law? No. But the expert in this court and the Supreme Court have said in I'm looking at the district court's conclusion. He says a reasonable jury could conclude alternative techniques were available to subdue Decedent rather than the use of deadly force. So what's wrong with that conclusion? The mere fact that alternatives are available doesn't mean that they're required as a matter of law. Okay. And how do we determine that, whether they're required or not? Under the totality of the circumstances that the officers And the district court said that's a jury question. I have to look at the totality of the facts here, and I can't determine that. So he says I need to refer that over to the jury. But I don't think that, and the Supreme Court has said in Sheehan, that the mere suggestion by an expert that alternatives are available is not sufficient to overcome summary judgment. We can all Monday morning put it back. If the facts are without material dispute. But where is the dispute? These officers tried the taser three times. It didn't stop Mr. Pena. They tried that. Mr. Pena kept coming toward the officer. The officer has no duty to retreat, but in fact did. The only reason the officer used deadly force is because Mr. Pena, no one else, Mr. Pena grabbed the knife and came at the officer. At that point, there is no reasonable alternative to responding to a deadly threat. I don't know how much more the officer could have retreated. You want to save five minutes? You have three, four minutes. All right. Thank you. Good morning. May it please the court, I'm Ayanna Curry for Plaintiff Monica Ortiz. I wanted to address, start with your Honor's question. I think it's to the heart of the matter. Even though there is a video, and we can all see, I guess, from the eyes what the officers are seeing, if there still is a reasonable, a material fact question about the reasonable inferences that can be drawn from the video, then the video simply can't end the existence of any material fact question. So here we have these, let's see, we have these officers who come in with guns drawn to a domestic violence situation, to a domestic violence call that had ended and had ended for some time before they even got there. Then we have two officers, which was never addressed by the other side so far. We have a second officer who has the ability to have the taser. The district court didn't just find that there's less, or as a part of the least intrusive alternative means was the availability of the second officer to help, to tase, to do something and diminish this need. Frankly, to me, there was no need ever for deadly force. I want to address a few of the things we've heard this morning. This focus, this so-called mistaken focus on the underlying crime. Graham analysis is an analysis of a set of factors. And the district courts, the courts engage and they look at each factor and come up with an answer. And then once you have an answer for each factor, you balance them based on the totality of the circumstances. I think trying to say, I'm not saying that what Mr. Pena did in front of his conduct, in front of the officers might itself have been itself a crime. What are the reasonable inferences that can be drawn? Was there a threat? Is the man, what was he doing with the knife? You know, it is seen that he raises the knife, but it's so lame. It's so lame. It's so limp. I would, I think there's a question about if he grasped it. He definitely does raise it, but he's on his seat and he was never able to regain his seat from the initial tasing. And you could tell that the taser is working because he's writhing in agony after each, after each and in between each deployment. We're not saying that there's a duty to retreat. No, there is no legal duty to retreat. But within Graham analysis, you certainly are supposed to consider whether there were less intrusive alternatives. For example, redeploying, taking a step back, saying I will shoot you. They never even said I will tase you. I think it's a, it's a mischaracterization that he's scooting and attacking the officer. I think that's a definite question because like your Honor pointed out, he was talking to his wife the whole time. Why did you call the police on me? The language, I guess it was Justice Scalia uses is that the video recording must utterly discredit, must utterly discredit. And I think we've all, your, your honors have pointed out the facts that a reasonable jury would be able to question is that all notwithstanding, was he a threat from his seat? Lamely holding this knife that had fallen out of his pocket. It's also a question of, Oh, he's got a knife. He's got a knife that what I hear the officer saying is knife, knife, knife. From the moment the knife falls out of his pocket and it was on the ground for a while before he even scoots across it. A reasonable jury can certainly look at that and say the only reason you shot him was because of the presence of the knife and not certainly not because of the threat he posed. The clearly established question. There's case law longstanding that there's less of an interest of using deadly force on a subject who's on his seat, who's on the ground, who's already wounded. And certainly for the second shot, who's already mortally wounded, who's already been shot. But there's enough clearly established law on the first shot. He's already on the ground. The taser is working. He's already wounded from the taser. Any questions for me? No. Thank you. Thank you. Thank you, Your Honors. And just in my little bit of remaining time, in terms of the alternatives, they tried the taser three times. It didn't work. He was still able to grab a knife. In terms of the gesture itself, this court said in George versus Morris, although in that case where the individual was in a walker and had a gun pointed down at the ground, they said any harrowing gesture with a weapon is sufficient to justify deadly force. That's clearly established law. I don't think anybody could draw an inference that Mr. Pena grabbing that knife in less than five feet from the officer and raising it toward the officer is anything less than a harrowing gesture. That is a matter of law. This court has said justifies the use of deadly force. I have yet to hear any clearly established case to the contrary, which would have put these officers on notice beyond debate that their actions in those split seconds would have violated some clearly established law. So whether there's an inference or a material issue of fact that a jury could draw from the second prong must be addressed, and that is whether there's a clearly established law. And certainly we've all heard several times from the Supreme Court how important it is that that not be a generalized statement of use of reasonable force, but must be specific to the facts so that any officer would know beyond debate that his actions in those split seconds would violate a clearly established law. And I don't think that exists. So under either prong, and we believe both, we believe qualified immunity should have been applied under the law that certainly the Supreme Court has made clear since Judge Bernal had an opportunity to look at this. All right. Thank you, Counsel. Ortiz v. Vissara is submitted.
judges: Fernandez, Wardlaw, Bybee